OPINION
{¶ 1} Defendant-Appellant Jeffrey Buelow appeals from the dismissal of his petition for post-conviction relief, without a hearing. Buelow contends that the trial court erred by dismissing his petition without an evidentiary hearing on various claims, including the State's alleged concealment of the complainant's pre-existing mental and emotional health problems; discrepancies in grand jury and trial testimony; ineffective assistance of counsel; and the self-confessed mental impairment of a trial juror.
 {¶ 2} In order to assess Buelow's claims, we have reviewed the entirety of the trial record, including all trial transcripts and the transcript of the grand jury proceeding. We conclude that the trial court did not err in dismissing the petition for post-conviction relief without an evidentiary hearing. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 3} In March, 2004, Jeffrey Buelow was convicted of two counts of burglary and one count of rape, and was sentenced to three years imprisonment each for the rape and for one burglary charge. The court imposed a sentence of six months on the other burglary charge, merged the burglary charges for sentencing, and ordered that the sentences be served concurrently. The court also classified Buelow as a sexually-oriented offender. We affirmed the conviction and sentence on November 12, 2004, in State v. Buelow, Clark App. No. 2004 CA 18,2004-Ohio-6052.
 {¶ 4} Buelow filed a timely petition for post-conviction relief in December, 2004. He also filed three supplements to the petition. More than a year later, in February, 2006, the trial court dismissed the petition without holding a hearing. Buelow appeals from the order dismissing his petition.
 II {¶ 5} Buelow's First Assignment of Error is as follows:
 {¶ 6} "THE TRIAL COURT ERRED IN DENYING AN EVIDENTIARY HEARING ON PETITIONER'S CLAIM THAT EVIDENCE OF COMPLAINANT'S PRE-EXISTING MENTAL AND EMOTIONAL HEALTH PROBLEMS WAS NOT PROVIDED AS ORDERED BY THE COURT BUT WAS KNOWINGLY CONCEALED BY THE STATE AND BY THE COMPLAINANT."
 {¶ 7} The record in the present case indicates that Buelow and the victim, E.R., dated each other for several months in 2002, while they were students at Wittenberg University. They stopped dating after Buelow graduated and moved to Alaska in the summer of 2002, but still remained friendly. They exchanged e-mails and occasional phone calls, and also met over New Year's weekend that year, when they both happened to be in Chicago visiting mutual friends.
 {¶ 8} E.R. graduated from Wittenberg in May, 2003, and was living temporarily with friends in Springfield, Ohio, until she began a new job in another town. When Buelow returned to the area in June, 2003, for a wedding, E.R. and Buelow met for lunch. A few days later, Buelow called E.R., and arranged to come down to Springfield from Columbus, Ohio, where he was staying. Buelow met E.R. and some of her friends at a bar called Heroes, where they were having drinks. From there, the group went to another bar called Station One. Late in the evening, the group ended up at a bar called McMurrays, where they stayed until after closing.
 {¶ 9} E.R. testified that she asked a friend to follow her home from McMurray's because Buelow was making her feel uncomfortable and unsafe. When E.R. got home, she talked to her current boyfriend, Nick, and then went to bed. E.R. woke up sometime later, to find Buelow on top of her, with his penis inside her vagina. After pushing him off, she ran to her roommate's room, and jumped in bed with her roommate. At that point, she was shaking and crying.
 {¶ 10} Buelow did not testify. However, in a statement given to the police, he indicated that he and E.R. were "hanging out" throughout the evening, but had gotten separated at some point. Later on, Buelow went to E.R.'s house, knocked on the door, and got no response. He then went up to E.R.'s bedroom, and knocked on her door a few times. After receiving a response, he asked E.R. if she wanted some company, and she said, "Of course." At that point, he laid down on the bed and they began kissing for about ten minutes. E.R. then became upset, started crying, and left the room.
 {¶ 11} There was testimony at trial corroborating both sides of the story. E.R. presented a witness who verified that E.R. was distraught at McMurray's and said she could not be around Buelow any more. The same witness also stated that E.R. was obviously inebriated and was acting drunk. Several witnesses in E.R.'s house testified to E.R's sobbing and general hysteria after the rape, and for some time afterward. One of these witnesses said that Buelow looked "dumbfounded and confused" when he followed E.R. into her roommate's bedroom immediately after the incident.
 {¶ 12} Buelow presented testimony from witnesses who said that E.R. did not appear distraught in any way while at McMurray's, and that Buelow and E.R. were socializing with each other at the bar. These witnesses also recounted statements from E.R. about the fact that she was about to "get in trouble" that night.
 {¶ 13} Trial in this case was originally scheduled for November 19, 2003. On September 30, 2003, Buelow filed a motion asking, among other things, that E.R. be required to disclose any medical or psychiatric problems that would have resulted in loss of memory, sleep-walking, narcolepsy, or other "deep sleep" disorder. Buelow also noted in the motion that E.R. had disclosed mental illness of other family members in the past.
 {¶ 14} During a November 6, 2003 hearing held before a visiting judge, the prosecutor said that he had turned over all relevant medical records and knew of no other medical problems the victim may have had. The prosecutor further said that he would have to check, but that he did not think E.R. had undergone any psychiatric treatment at the time the incident occurred. At that point, the trial judge stated if there were medical records indicating that E.R. had undergone psychiatric treatment, the defense was entitled to know if a causal connection existed or if the treatment was the result of an ongoing problem. In this regard, the judge commented that:
 {¶ 15} "But if she doesn't have a psychiatric history, why don't we cut them off at the pass and say, hey, this isn't the case and that quits bothering him and quits bothering you and quits bothering me.
 {¶ 16} "Mr. Wilson: We can do that.
 {¶ 17} "The Court: Okay. Now, if she does have one, then I think we've got something to argue about, and I guess that's — I see that as a problem."
 {¶ 18} On the day trial was scheduled to begin, the State indicated that it had learned on November 6, 2003, that E.R. was seeing a counselor, Sharon Vary. The State had notified Buelow a week or so earlier that it intended to use Vary as a witness at trial. Two days before trial, the State had also disclosed another expert, a Dr. Duffee. When the defense objected, the State said that it wished to go forward with the trial without the witnesses. However, the defense still objected, because there was no way at that point to determine whether the psychological treatment stemmed from something that had occurred before the rape.
 {¶ 19} The State assured the court that E.R. had no prior treatment. The State further said that it would not attempt to call Vary and would advise its witnesses not to mention her. Nonetheless, based on the defense objections, the court continued the trial to give the defense an opportunity to explore the evidence that had been disclosed. In view of the continuance, the court subsequently granted the State's request to call Vary and Duffee at trial. The court then set a new trial date for February 25, 2004.
 {¶ 20} On February 3, 2004, Buelow filed a motion to exclude the testimony of Duffee and Vary. The motion noted that Buelow's attorney had learned on January 12, 2004, that E.R. had rescinded her prior authorization for Vary. The State had also notified Buelow that it had not received any reports or compilations from Vary and did not intend to call her as a witness. However, on February 9, 2004, the State disclosed an additional witness — a child and family therapist (Suzanne Sunshine), who had seen E.R. on January 20, 2004. The defense then objected to this witness in a motion for disclosure and other relief, asked the court for a ruling on its pending motion for disclosure of all original medical, psychological, and psychiatric records for E.R., and for an order suppressing Sunshine's report.
 {¶ 21} On the first day of trial (February 24, 2004), the court considered the motion for disclosure. At that time, the prosecutor stated that Vary's records were not provided because E.R. had rescinded consent and the State did not obtain the records. The court noted that absent consent, the records would have had to be obtained by subpoena, but no one had issued a subpoena. Consequently, the court overruled the defense request for Vary's records.
 {¶ 22} The court did agree with the defense that the consultation with Sunshine was an improper attempt to bolster the victim's credibility, when the victim did not want to provide access to her counselor. Accordingly, the court refused to allow Sunshine to testify. The trial then began, without Sunshine's testimony, and without disclosure of any psychological records.
 {¶ 23} During trial, E.R. testified about various emotional problems she had since the incident, including feeling unsafe and unable to trust others, being startled easily, having problems sleeping and with nightmares, and having trouble feeling comfortable around male friends. E.R. also stated that she had stress or panic attacks in social settings, mostly in bar situations, when she got panicked about who was around her. E.R. denied attending counseling sessions before the incident, and stated that she did not start counseling until August, 2003. E.R. also testified that she had been attending counseling with a woman named Sharon Vary. When the defense objected, the court told the jury to disregard the name of the counselor that E.R. had seen.
 {¶ 24} The petition for post-conviction relief included affidavits from the following people: (1) Jeffrey Buelow; (2) Matthew Arntz, the attorney who represented Buelow in post-conviction proceedings; (3) Voldymer Strileckyj, Buelow's trial attorney; (4) Paul Avery, a juror who had served during trial; and (5) Ethan Moore and Holli Jacobs, two Wittenberg graduates who had known both E.R. and Buelow. Moore's affidavit indicated that E.R. had said there were serious problems in her family while she was growing up. Moore also stated that he had the impression from E.R.'s comments that she or her family had received some kind of therapy. Jacobs stated that E.R. had said there was some kind of previous abuse in her family history and that E.R.'s father had received some kind of "help" as a result.
 {¶ 25} Buelow's post-conviction attorney, Matthew Arntz, also recounted conversations he had with unidentified former Wittenberg students who had commented on E.R.'s outbursts, extreme reactions and mood-swings, and emotional "neediness." In a third supplement to the petition, Arntz mentioned E.R.'s Victims of Crime Compensation application to the State of Ohio, which apparently listed two additional counselors E.R. had seen. These counselors were "For Women, Inc." (consulted the day after E.R.'s grand jury testimony), and Kay Ackerman-Martin, a licensed professional clinical counselor. Arntz indicated that he had attached the application to the third supplement to the post-conviction petition. However, the application is not contained in the record on appeal.
 {¶ 26} The trial court dismissed the post-conviction petition without holding an evidentiary hearing. In considering the issue of psychological records, the trial court relied on the due process analysis contained in Pennsylvania v. Ritchie (1987), 480 U.S. 39,107 S. Ct. 989, 94 L.Ed.2d 40. Specifically, the trial court relied on the concept that the State "has a duty to disclose all evidence in its possession that is favorable to the accused and material to guilt or punishment," and that evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Trial court decision, p. 10, quoting fromRitchie, 480 U.S. at 57.
 {¶ 27} In applying these standards, the trial court first noted that the psychological records were never in the State's possession. The court then stressed that even if the State had possessed the records, the evidence would not have been material. In this regard, the court opined that it would be speculative to assume that the victim's testimony would have been impeached by evidence of prior psychological diagnoses.
 {¶ 28} We disagree with the trial court's reasoning. If the nature of an item of evidence is unknown, the effect of the evidence would generally also be unknown. Specific examples can illustrate this point. For example, if a victim's prior psychological history consists simply of treatment for fear of heights, the history would likely have no impact on her credibility. By the same token, if the victim had been treated for repeated lying or delusional behavior, or had, indeed, lied about the fact of prior treatment, then her credibility may have been impacted. Unless and until Buelow is afforded an evidentiary hearing, the court cannot effectively assess Buelow's ability to show the materiality of the psychological records.
 {¶ 29} However, while we disagree with the trial court's conclusion on the possible effect of the evidence, we do not disagree with the ultimate result. In State v. Perry (1967), 10 Ohio St.2d 175,226 N.E.2d 104, the Ohio Supreme Court stated that "[c]onstitutional issues cannot be considered in postconviction proceedings * * * , where they have already been or could have been fully litigated by the prisoner while represented by counsel, either before his judgment of conviction or on direct appeal from that judgment, and thus have been adjudicated against him." Id. at paragraph seven of the syllabus. Because the issue of access to E.R.'s psychological records could have been fully litigated on direct appeal, the trial court was precluded from considering the matter in the postconviction proceeding.
 {¶ 30} The judge who originally considered the issue agreed that E.R.'s prior psychological treatment could be relevant, and granted a continuance so that trial counsel could explore the matter. However, trial counsel failed to subpoena the records from the care provider after E.R. rescinded her authorization. If the records had been subpoenaed, existing law would have allowed the trial court to conduct an in camera review to determine the relevance of the treatment and whether the records should be released. See State v. Hall (Nov. 21, 2001), Montgomery App. 18274, 2001-Ohio-1842, 2001 WL 1472938, *4 (in which both the trial court and the appellate court examine medical records to determine if a victim's pre-incident suicide attempt was material to the defense theory of the case). See, also, State v.Haverland, Hamilton App. No. C-050119, 2005-Ohio-6887, at ¶ 10, reversed in part on other grounds, In re Ohio Criminal Sentencing StatutesCases, 109 Ohio St.3d 411, 2006-Ohio-2394, 848 N.E.2d 809, at ¶ 16 (noting that the trial court had released the victim's school, medical, and psychiatric/psychological records to the defendant, after anin camera review); State v. Riffle (1982), 3 Ohio App. 202,444 N.E.2d 486; State v Armington (Dec. 30, 1988), Lake App. No. 12-015,1998 WL 142043, *3-4; State v. Verdine (Feb. 10, 1986), Franklin App. No. 85AP-696, 1986 WL 2482, *2-3; and State v. Wolfe (1992),81 Ohio App.3d 624, 627, 611 N.E.2d 976.
{ ¶ 31} During his original appeal, Buelow could have alleged that trial counsel was ineffective in having failed to subpoena the psychological records. He did not do so. Buelow could also have raised the issue of whether prior treatment existed, and whether that prior treatment was material to E.R.'s credibility, but he did not raise this issue, either. In fact, the only issue that was raised on appeal was whether the psychological records may have been relevant to a "reduced ability to correctly and accurately perceive and relate events."State v. Buelow, 2004-Ohio-6052, at ¶ 25. Finally, Buelow could have alleged that the trial court erred in refusing to order disclosure when the matter was raised at the beginning of trial. While this matter would likely have been considered waived because counsel did not subpoena the records, it could have been reviewed under a plain error analysis. See,e.g., State v. Richmond, Greene App. No. 2005-CA-105, 2006-Ohio-4518, at ¶ 36 (applying plain error doctrine).
{ ¶ 32} Buelow is attempting to argue now that he was unaware of prior treatment at the time of trial, and that this issue relies on matters outside the record, which can only be addressed in post-conviction proceedings. We disagree, for several reasons. In the first place, the issue was before the court, and the court indicated that prior treatment could be relevant. However, counsel did not subpoena the records, which would have provided a record for direct appeal.
{ ¶ 33} As an additional matter, the facts in question were ones that Buelow and his counsel would have been aware of before trial. Buelow dated the victim for several months and would have been familiar with her outbursts or emotional neediness, assuming they were relevant. Buelow also listed one of the post-conviction witnesses (Jacobs), as a trial witness. Presumably, counsel spoke with his own witness and could have leaned about prior alleged abuse in E.R.'s family.
{ ¶ 34} Furthermore, Buelow's original "motion to suppress and for other relief," filed on September 30, 2003, states that "[t]estimony will also show that the alleged victim had disclosed mental illness of other family members to the Defendant in the past." Accordingly, these matters could have been raised during the direct appeal, and the current attempt is barred by res judicata. Evidence outside the record, by itself, does not guarantee the right to an evidentiary hearing. To overcome the barrier of res judicata, "the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record." State v. Combs (1994),100 Ohio App.3d 90, 97, 652 N.E.2d 205. Buelow's First Assignment of Error is overruled.
 III { ¶ 35} Buelow's Second Assignment of Error is as follows:
{ ¶ 36} "THE TRIAL COURT ERRED IN DENYING AN EVIDENTIARY HEARING ON PETITIONER'S CLAIM THAT WITNESSES' GRAND JURY TESTIMONY CONTAINED SIGNIFICANT DISCREPANCIES WHICH OUGHT TO HAVE BEEN PROVIDED DEFENSE COUNSEL FOR CROSS-EXAMINATION."
{ ¶ 37} Before trial, Buelow asked for access to the grand jury testimony, but the trial court refused because Buelow failed to show a particularized need for the testimony. At a hearing on this issue, the parties discussed the fact that the trial court could review the grand jury transcript for inconsistencies during trial. However, Buelow did not ask the court to review the testimony during trial, nor does the record indicate that the court made a comparison of its own accord.
{ ¶ 38} At some point before filing the post-conviction petition, Buelow's post-conviction attorney, Matthew Arntz, reviewed the grand jury transcript, which had apparently been left unsealed in the trial court file. Based on this review, Arntz raised certain alleged inconsistencies in the testimony. These included the fact that police officer David Emmel told the grand jury that E.R. said she did not really pay much attention to Buelow during the evening of the assault. In contrast, E.R. had testified at trial that she got a strange feeling during the evening while in Buelow's company, and that he made her feel uncomfortable, scared, and unsafe.
{ ¶ 39} E.R. also testified at trial that Buelow's entry into her residence, a few days before the incident, when he picked her up for lunch, was only just inside her doorway. The prosecutor stressed this point in closing argument, claiming that Buelow had let himself into a house where he had never really been before. In contrast, E.R. told the grand jury that Buelow came inside the house and sat there when he picked her up for lunch.
{ ¶ 40} Other alleged discrepancies included differences in how Buelow announced his presence before entering E.R.'s house on the night of the rape, and a more ambivalent tone that E.R.'s roommate used when testifying before the grand jury, as opposed to the roommate's tone at trial.
{ ¶ 41} In State v. Greer (1981), 66 Ohio St.2d 139, 420 N.E.2d 982, the Ohio Supreme Court stressed that:
{ ¶ 42} "Grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy. * * *
{ ¶ 43} "Whether particularized need for disclosure of grand jury testimony is shown is a question of fact; but, generally, it is shown where from a consideration of all the surrounding circumstances it is probable that the failure to disclose the testimony will deprive the defendant of a fair adjudication of the allegations placed in issue by the witness' trial testimony.
{ ¶ 44} " * * * When defense counsel asserts and establishes to the satisfaction of the trial court a particularized need for certain grand jury testimony, the trial court, along with defense counsel and counsel for the state, shall examine the grand jury transcript in camera and give to defense counsel those portions of the transcript relevant to the state's witness' testimony at trial, subject to the trial court's deletion of extraneous matter, and issuance of protective orders where necessary." Id. at paragraphs two, three, and four of the syllabus.
{ ¶ 45} The same "particularlized need" analysis is applied to both trial and post-conviction proceedings, and a defendant's claim of need does not automatically entitle him to the records. Instead, the defendant "must first make a colorable claim for post-conviction relief and then seek the transcripts." State v. Walker, Lawrence App. No. 04CA16, 2005-Ohio-1584, at ¶ 7.
{ ¶ 46} In the present case, defense counsel did not seek permission, but took advantage of the fact that the transcript happened to be unsealed. The trial court admonished counsel for breaking the rules, but went on to find that there were no meaningful inconsistencies in the testimony. In this regard, the trial court relied on the following standard:
{ ¶ 47} "It is enough if the proffered testimony, taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict." State v. Slocum, Wood App. No. WD-04-054, 2005-Ohio-3869, at ¶ 25 (citations omitted).
{ ¶ 48} After reviewing the record, we find that counsel's failure to comply with requirements for seeking grand jury transcripts precludes review of this matter. R.C. 2939.11 states that the reporter of grand jury proceedings is under an obligation of secrecy not to disclose any testimony "unless called upon in court to make disclosures." The proper method of obtaining disclosure is a petition to the court that supervised the grand jury. In re Petition for Disclosure of EvidencePresented to Franklin County Grand Juries (1980), 63 Ohio St.2d 212,407 N.E.2d 513, at paragraph two of the syllabus. Presumably, a petition for disclosure of grand jury testimony could be incorporated into a petition for post-conviction relief, and the court could then order materials disclosed based on a showing of particularized need.
{ ¶ 49} That is not what happened here. Instead of following proper procedures, counsel violated the secrecy of the grand jury proceedings by reading a transcript that happened to be unsealed. There was no excuse for this, as the front of the envelope states the name of the trial judge and case caption, and the back of the envelope bears the notations "Sealed by order of court," and "Do not open." It is obvious that the document was not to be viewed without an order from the court. However, even if this were not the case, anyone who looked at the cover page of the transcript would immediately see that the transcript was from the Clark County Grand Jury. At that point, the proper course of action would have been to return the transcript to the envelope, without reading it, and to seek permission from the court.
{ ¶ 50} In State v. Amison (1965), 2 Ohio App.2d 390, 208 N.E.2d 769, the Sixth District Court of Appeals strongly admonished a trial judge who had read grand jury testimony before ruling on a defendant's motion to withdraw a guilty plea. The court commented that "[i]n referring to the grand jury minutes under the circumstances here, the trial judge committed an unlawful act and acted in an arbitrary and unconscionable manner." Id. at 393. The standard of conduct for attorneys should be no less. Accordingly, we reject the second assignment of error, based on counsel's failure to comply with appropriate procedures. As an aside, we agree with the trial court that the differences in testimony were not sufficiently material to have been likely to have altered the outcome of the trial.
{ ¶ 51} Buelow's Second Assignment of Error is overruled.
 IV { ¶ 52} Buelow's Third Assignment of Error is as follows:
{ ¶ 53} "THE TRIAL COURT ERRED IN DENYING AN EVIDENTIARY HEARING ON PETITIONER'S CLAIMS OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL."
{ ¶ 54} Buelow contends that the trial court erred in denying an evidentiary hearing on claims of ineffective assistance of trial counsel. This error is based on trial counsel's failure to cross-examine E.R. about the fact that she was seen drinking in a bar on the evening of her first day of testimony. Buelow claims that trial counsel should have cross-examined E.R. on this point, and should have requested a brief delay to investigate the matter and subpoena witnesses.
{ ¶ 55} The two-step process for evaluating allegations of ineffective assistance of counsel is that:
{ ¶ 56} "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." State v. Calhoun,86 Ohio St.3d 279, 289, 1999-Ohio-102, 714 N.E.2d 905, quoting fromStrickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052,2064, 80 L.Ed.2d 674.
{ ¶ 57} In Calhoun, the Ohio Supreme Court also noted that:
{ ¶ 58} "In evaluating whether a petitioner has been denied effective assistance of counsel, this court has held that the test is `whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done.' * * * When making that determination, a two-step process is usually employed. `First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness.'
{ ¶ 59} "On the issue of counsel's ineffectiveness, the petitioner has the burden of proof, since in Ohio a properly licensed attorney is presumably competent." Id.
{ ¶ 60} The trial court found that counsel's decision not to question E.R. about the issue fell within the ambit of trial strategy. The trial court also concluded that even if counsel's decision fell below professional standards, the jury would not have doubted E.R.'s credibility sufficiently to acquit Buelow. In this regard, the trial court noted that E.R. would likely have offered an explanation. The trial court further stressed that the issue of difficulty in going out in public was too attenuated from the elements of the offense and was minor compared to the case as a whole.
{ ¶ 61} We agree with the trial court. On direct examination, E.R. testified that she had anxiety in social situations after the incident. E.R. stated that her anxiety was not as bad at the present time as it had been, but that in crowded places, mostly in bar situations, she became kind of panicked about who was around her, or anyone she could not see.
{ ¶ 62} During cross-examination, the following exchange occurred:
{ ¶ 63} "Q. * * * I think you testify [sic] sometimes you still have problems with crowds in bars.
{ ¶ 64} "A. Yes.
{ ¶ 65} "Q. So you still attend bars and that sort of thing?
{ ¶ 66} "A. Yes.
{ ¶ 67} "Q. And you still get drunk?
{ ¶ 68} "A. I still drink, yes.
{ ¶ 69} "Q. But my question is, you still get drunk?
{ ¶ 70} "A. Yes.
{ ¶ 71} "Q. What does that mean to you, getting drunk?
{ ¶ 72} "A. It means being inebriated, it means drinking a lot of alcohol." Trial Transcript, p. 312.
{ ¶ 73} In view of these admissions, trial counsel could well have concluded that further exploration of the topic was unnecessary. By E.R's own account, she still attended bars and still drank a lot of alcohol, despite her alleged fear of crowds. Nothing more would have been served by asking E.R. if she had been at a bar the previous evening, or by subpoenaing witnesses who had seen her there. As a result, trial counsel did not substantially violate his duties to Buelow.
{ ¶ 74} Buelow's Third Assignment of Error is overruled.
 V { ¶ 75} Buelow's Fourth Assignment of Error is as follows:
{ ¶ 76} "THE TRIAL COURT ERRED IN DENYING AN EVIDENTIARY HEARING AS TO THE SELF-CONFESSED MENTAL IMPAIRMENT OF A TRIAL JUROR HEREIN."
{ ¶ 77} The evidence submitted with the post-conviction petition indicates that a trial juror, P. A., contacted Buelow's trial counsel in the fall of 2004, because A. was concerned that he should not have served as a juror, due to a mental disability. A. did not disclose this disability to the trial court or to the parties during jury selection or during trial.
{ ¶ 78} In pertinent part, Ohio Evid. R. 606(B) provides that:
{ ¶ 79} "Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith. * * * However a juror may testify without the presentation of any outside evidence concerning any threat, any bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes."
{ ¶ 80} The Ohio Supreme Court has interpreted this rule to mean that:
{ ¶ 81} "In order to permit juror testimony to impeach the verdict, a foundation of extraneous, independent evidence must first be established. This foundation must consist of information from sources other than the jurors themselves, * * * and the information must be from a source which possesses firsthand knowledge of the improper conduct. One juror's affidavit alleging misconduct of another juror may not be considered without evidence aliunde being introduced first. * * * Similarly, where an attorney is told by a juror about another juror's possible misconduct, the attorney's testimony is incompetent and may not be received for the purposes of impeaching the verdict or for laying a foundation of evidence aliunde." State v. Schiebel (1990),55 Ohio St.3d 71, 75-76, 564 N.E.2d 54 (citations omitted).
{ ¶ 82} "Aliunde evidence is other distinct or independent evidence beyond the testimony volunteered by the juror himself." State v.Gleason (1996), 110 Ohio App.3d 240, 245, 673 N.E.2d 985. In the present case, the only information submitted to support juror misconduct was the affidavit of a juror, and an affidavit from trial counsel, who related what he had been told by the juror. Neither source was competent to provide the foundation required under Ohio Evid. R. 606(B), which has been specifically applied in post-conviction proceedings. See,e.g., State v. Hoffner, Lucas App No. L-01-1281, 2002-Ohio-5201, at ¶ 30.
{ ¶ 83} Buelow contends, however, that Ohio Evid. R. 606(B) does not prohibit inquiry in the present case, because he is constitutionally entitled to an impartial jury. Buelow's argument in this regard is that he is concerned only with the composition of the jury, if it included an individual who should have been disqualified due to long-standing, chronic mental illness.
{ ¶ 84} In State v. Franklin, Montgomery App. No. 19041, 2002-Ohio-2370, we noted that we cannot use Ohio Evid. R. 606(B) to entirely avoid constitutional violations. Id. at ¶ 55, citing Doan v.Brigano (C.A.6, 2001), 237 F.3d 722, 727-29. The Sixth Circuit Court of Appeals also cited Doan in holding that when Ohio courts have applied Ohio Evid. R. 606(B) "to dispose of biased jury claims," the courts have "violated clearly established Supreme Court precedent that recognizes the fundamental importance of a defendant's constitutional right to a fair trial." Mason v. Mitchell (C.A.6, 2003), 320 F.3d 604, 636.
{ ¶ 85} The United States Supreme Court discussed the constitutional right to a fair trial in some detail in Tanner v. U.S. (1987),483 U.S. 107, 107 S. Ct. 2739, 97 L.Ed.2d 90. In Tanner, the court noted that the nearly universal common law rule in the United States flatly prohibits "the admission of juror testimony to impeach a jury verdict."483 U.S. at 117. An exception is "recognized only in situations where the jury was allegedly influenced by an `extraneous influence.'" Id.
{ ¶ 86} However, the Supreme Court also noted in Tanner that defendants have a right to "a tribunal both impartial and mentally competent to afford a hearing." Id. at 127 (internal citation omitted). In this context, the Supreme Court observed that lower federal courts had previously employed a common law exception allowing "postverdict inquiry of juror incompetence in cases of `substantial if not wholly conclusive evidence of incompetency.'" Id. at 125, citing U.S. v.Dioguardi (C.A.2 1974), 492 F.2d 70, 80. In Tanner, the Supreme Court refused to decide whether Fed.R.Evid. 606(B) could be interpreted as retaining this common law exception. Instead, the Supreme Court decided that the submitted evidence fell far short of satisfying the standard for juror incompetence. Id.
{ ¶ 87} After Tanner, lower federal courts have continued to find that Fed.R.Evid. 606(B) "cannot be applied in such an unfair manner as to preclude due process." Anderson v. Miller (C.A.2 2003), 346 F.3d 315,327 (citations omitted). In Anderson, the Second Circuit Court of Appeals noted that Tanner had relied heavily on the Second Circuit's own decision in Dioguardi, which had upheld the rule that "possibleinternal abnormalities in a jury will not be inquired into except `inthe gravest and most important cases.'" Id. at 327 (citations omitted, emphasis in original).
{ ¶ 88} Assuming for the sake of argument that we should apply the rule followed by the federal courts, the circumstances of the present case do not qualify it as one of the "gravest and most important cases" meriting inquiry into possible internal abnormalities. InDioguardi, the Second Circuit noted that:
{ ¶ 89} "With respect to post-verdict evidence of possible juror incompetency during the trial, courts have refused to set aside a verdict, or even to make further inquiry, unless there be proof of an adjudication of insanity or mental incompetence closely in advance of the time of jury service. * * * Only when proof of this nature has been offered, or proof of a closely contemporaneous and independent posttrial adjudication of incompetency, * * * have courts conducted hearings to determine whether the disability in fact affected the juror at the time of trial." 492 F.2d at 80.
{ ¶ 90} In the present case, A.'s affidavit indicates that he suffered a nervous breakdown in 1966, and received electric shock treatments in the 1970's, or about thirty years before Buelow's trial. There was no indication that A. had been adjudicated insane or mentally incompetent at a time closely contemporaneous with Buelow's trial. Accordingly, the trial court did not err in refusing to hold an evidentiary hearing on the issue of A.'s potential incompetence.
{ ¶ 91} Buelow's Fourth Assignment of Error is overruled.
 VI { ¶ 92} All of Buelow's assignments of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF and DONOVAN, JJ., concur.